Filed 4/22/16  Hale Industries v. Schlecht, Shevlin & Shoenberger CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| HALE INDUSTRIES, INC., | |
| Plaintiff and Appellant, | E064592 |
| v. | (Super.Ct.No. PSC1500848) |
| SCHLECHT, SHEVLIN & SHOENBERGER, ALC, | OPINION |
| Defendant and Respondent. | |

APPEAL from the Superior Court of Riverside County.  David M. Chapman, Judge.  Affirmed.

Law Office of Mitch Wallis, Mitch Wallis and Alex Sliheet, for Plaintiff and Appellant.

Schlecht, Shevlin & Shoenberger and David A. Darrin for Defendant and Respondent.

Plaintiff and appellant Hale Industries, Inc. is the lessee of certain real property held in trust by the United States for the nonparty lessor, who is a member of a Native

1

American tribe. Because the land is held in trust by the United States, any lease extension is subject to approval by the Bureau of Indian Affairs (BIA). Defendant and respondent Schlecht, Shevlin & Shoenberger, ALC (SSS Law) is the law firm that represented the lessor in negotiations with plaintiff regarding a lease extension.

Plaintiff alleges that, as a part of the negotiations with the lessor, it entered into a separate contract with SSS Law for plaintiff to pay some of the lessor's legal fees. Plaintiff contends it subsequently reached an agreement with the lessor regarding the lease extension, but BIA approval was not obtained because SSS Law "breached its implied affirmative duty under its fee agreement contract" in several respects. Plaintiff seeks damages in the amount of the extra revenue it expected to receive as a result of the lease extension, less the attorney fees it would have paid under the fee agreement. SSS Law's position is that no final agreement was ever reached, and therefore no contract created, either with respect to a lease extension or payment of the lessor's legal fees.

The operative first amended complaint (FAC) asserts a single cause of action against defendant, for breach of the implied covenant of good faith and fair dealing. The trial court granted defendant's demurrer to the FAC, finding that plaintiff had failed to plead sufficient facts to establish the existence of a contractual agreement between plaintiff and SSS Law, and denied plaintiff further leave to amend. We find no error, and affirm.

## I. FACTS AND PROCEDURAL BACKGROUND

The present lawsuit arises out of negotiations between plaintiff, who is the lessee of certain land located in Palm Springs, California, and the nonparty lessor, regarding an

2

extension of the lease. Plaintiff has subleased part of the property to the tenants of 120 condominium units that plaintiff built on the land. The lessor is a member of a Native American tribe, and the land at issue is held in trust for her by the United States; as such, any lease extension agreement is subject to approval by the BIA. SSS Law is the law firm that represented the lessor in the negotiations with plaintiff regarding the lease extension.

Plaintiff alleges in the FAC, filed May 28, 2015, that, "to continue the negotiations, Defendant demanded and obtained a separate contract between the Defendant law firm and the Plaintiff," requiring plaintiff to pay SSS Law up to $25,000 to cover a portion of the legal fees incurred by the lessor during the course of the negotiations. The fee agreement was not separately formalized: plaintiff alleges that a series of emails between plaintiff and SSS Law, attached as exhibits to the FAC, "served as a memorialization," so it "never bothered to send Defendant a formal memorialization of the terms of the agreement."

Plaintiff further alleges that the lease extension agreement "was subsequently agreed upon, signed and notarized by both parties." Nevertheless, SSS Law informed plaintiff that the signed and notarized version of the lease extension agreement would be "honored on its end" only if plaintiff paid $35,000 of legal fees immediately upon BIA approval. Plaintiff declined to accept those terms. Subsequently, plaintiff sought BIA approval of the signed and notarized lease extension agreement, but failed to obtain approval because "original signatures" were required for the BIA to process the application. SSS Law "refused to provide the BIA with its originals."

3

The FAC asserts a single cause of action, for breach of the implied covenant of good faith and fair dealing. Attached to the complaint are seven documents. One is a copy of a lease extension agreement, signed and notarized by the lessor on November 11, 2013. The proposed draft was eventually signed and notarized by plaintiff too, but not until October 2, 2014.[1] The other attachments are the six emails that plaintiff asserts "served as a memorialization" of the alleged fee agreement between plaintiff and SSS Law, and which we must discuss in some detail, given the arguments raised on appeal.

The first attached email is from plaintiff's counsel to the SSS Law attorney representing the lessor, sent October 4, 2012. In it, plaintiff's counsel summarizes a phone conversation with lessor's counsel, beginning by thanking him for "reaching out towards a final agreement" regarding the lease extension. The summary of possible terms that had been discussed includes, in relevant part, that if the parties agree to terms on a lease extension agreement that are "acceptable to both parties then the parties will share equally [SSS Law's] legal fees provided that [plaintiff] will not be charged more than $25k in any case." At the end of his email, plaintiff's counsel asks for confirmation

---

[1] In briefing on appeal, both parties state that the draft of the lease extension agreement, signed and notarized by the lessor, was sent to plaintiff with a two-week window for plaintiff to accept it, by signing and notarizing in turn. Neither the FAC, nor any document attached to the FAC, references or otherwise demonstrates this limitation on the offer. It is therefore questionable whether we may consider the limitation in the present procedural posture. In any case, for present purposes, we need not, and do not, consider it.

that the "above deal points are accurate" so that he "may proceed and discuss with [his] parents."[2]

The second attached email, apparently[3] a response by lessor's counsel to the first attached email, also sent on October 4, 2012, begins "That's the gist of it." It does not specifically discuss the attorney fee issue, instead only clarifying a point on another issue related to the lease extension.

The third attached email, sent October 5, 2012, from plaintiff's counsel to lessor's counsel, states that "in light of all of our prior negotiations and respective positions, here is what we propose as terms . . . ." The proposed terms include the following: "(5) [Plaintiff] will split your attorney fees with [the lessor] on a 50/50 basis with a maximum cap of $25,000 payment by [plaintiff]. [Plaintiff's] portion of your attorney fees will be paid upon execution of the 1st 12 subleases by individual homeowners after approval by the BIA of the Master Lease Extension." The email ends by asking lessor's counsel to confirm whether the lessor "will consent to the above terms." Plaintiff alleges, however, that this email received no response.

The fourth attached email, sent on April 16, 2013, is from lessor's counsel to plaintiff's counsel. It begins by stating that "[i]f we are going to have a chance to finalize

_____

[2] Plaintiff's counsel is the son of plaintiff's two shareholders.

[3] Plaintiff alleges that the email copied in attachment 2 to the FAC is a response to the email copied in attachment 1. We accept this representation as true for present purposes, but because plaintiff did not attach complete copies of the correspondence— including omitting headers and severing email chains into separate attachments, and apparently omitting portions of those chains—it is impossible to make this determination from the face of the documents alone.

5

a lease extension amendment I think we will have to exchange drafts (so that we can clear up any confusion and we do not have to continue to speculate as to what provisions we would each like to see in a final document)." The email makes reference to two alternate drafts prepared by SSS Law that were attached to the email, but not included in the attachment to the complaint. The issue of attorney fees is mentioned in a postscript: "Aside from the terms of the actual lease amendment, which I am hoping we will finalize after receiving our comments as outlined above, the one other item that should be confirmed is [plaintiff's] responsibility for paying 1/2 of [the lessor's] legal fees, with a cap of $25,000. With where we now stand, I anticipate [plaintiff] will hit the cap by the time this deal is done (after this month we may be at the cap). Please confirm [plaintiff] will be able to pay these fees at such time as the BIA approves the [lease extension agreement]."

The fifth attached email is from plaintiff's counsel to lessor's counsel, also sent on April 16, 2013. It states in relevant part that "we have agreed to pay 1/2 of your fees up to $25k but we specified that the payment would come when we receive $25k in extension fees from the first handful of homeowners that sign the sublease extension[.] [T]hat way my folks do not have to come out of pocket for the attorney fees."

The sixth attached email, from the lessor's counsel to plaintiff's counsel, also on April 16, 2013, addresses the attorney fee issue as follows: "As for our fees, while I am sure you can understand that I would prefer they be paid in full at the time the BIA approves the amendment, if this is not possible for your parents and they absolutely need to use the funds coming out of the first handful of extension fees, please prepare a simple

6

agreement between your parents and my firm, that will explain how this will work so that I can have some comfort that the fees will be paid in a reasonable manner and in some relatively short amount of time after approval of the [lease extension]."

In the sixth email, the lessor's counsel also proposed several possible alternative ways to incentivize sublessees to "sign up" for sublease extensions quickly. The FAC alleges that plaintiff accepted this suggestion, proposing certain changes to "opt-in extension fees to more incentivize the opt-in tenants." The FAC is ambiguous as to when precisely plaintiff made this proposal, or what draft or specific set of terms served as the starting point from which these changes differed. Apparently, however, the signed and notarized lease extension agreement also attached as an exhibit to the FAC was that starting point—no specific alternative interpretation, at least, is readily gleaned from plaintiff's allegations.[4]

Defendant's demurrer to the FAC was filed on June 26, 2015, and heard by the trial court on August 5, 2015. The court found that the FAC "fails to plead a contractual agreement between the parties," and sustained the demurrer on that basis. The court denied leave to amend, stating that the deficiencies of the FAC were the same as the initial complaint, to which a demurrer had previously been sustained.

---

[4] In briefing on appeal, the parties agree that plaintiff proposed the changes regarding sublease incentives sometime in 2014.

7

## II. DISCUSSION

### A. Standard of Review.

On an appeal from a judgment of dismissal on a demurrer, we treat the plaintiff's properly pleaded factual allegations as true. (*Aubry v. Tri-City Hospital Dist.* (1992) 2 Cal.4th 962, 966-967.) We accept as true facts appearing in exhibits attached to the complaint, and, to the extent they conflict with the allegations in the pleading, we give them preference. (*Brakke v. Economic Concepts, Inc.* (2013) 213 Cal.App.4th 761, 767-768 (*Brakke*).) We do not accept as true contentions, deductions, or conclusions of fact or law. (*Zelig v. County of Los Angeles* (2002) 27 Cal.4th 1112, 1126.) "[O]ur standard of review is de novo, 'i.e., we exercise our independent judgment about whether the complaint states a cause of action as a matter of law.'" (*Santa Teresa Citizen Action Group v. State Energy Resources Conservation & Development Com.* (2003) 105 Cal.App.4th 1441, 1445.) "We are not bound by the trial court's stated reasons, if any, supporting its ruling; we review the ruling, not its rationale." (*Mendoza v. Town of Ross* (2005) 128 Cal.App.4th 625, 631.)

### B. Analysis.

This appeal turns on application of well-established principles of contract formation. Plaintiff is incorrect when it asserts that it adequately pleaded the existence of a contract between it and SSS Law. We therefore affirm the judgment.[5]

---

[5] Plaintiff has not contested on appeal the trial court's determination with respect to leave to amend, arguing only that its claim was properly pleaded.

"The prerequisite for any action for breach of the implied covenant of good faith and fair dealing is the existence of a contractual relationship between the parties, since the covenant is an implied term in the contract." (*Smith v. City and County of San Francisco* (1990) 225 Cal.App.3d 38, 49.) "An essential element of any contract is the consent of the parties, or mutual assent. [Citations.] Mutual assent usually is manifested by an offer communicated to the offeree and an acceptance communicated to the offeror. [Citation.] ""An offer is the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it."' [Citations.]' [Citation.] The determination of whether a particular communication constitutes an operative offer, rather than an inoperative step in the preliminary negotiation of a contract, depends upon all the surrounding circumstances. [Citation.] The objective manifestation of the party's assent ordinarily controls, and the pertinent inquiry is whether the individual to whom the communication was made had reason to believe that it was intended as an offer. [Citation.]" (*Donovan v. RRL Corp.* (2001) 26 Cal.4th 261, 270-271.) With respect to acceptance of an offer, "(1) a valid acceptance must be absolute and unqualified [citation], and (2) qualified acceptance constitutes a rejection terminating the offer; it is a new proposal or counteroffer which must be accepted by the former offeror now turned offeree before a binding contract results." (*Landberg v. Landberg* (1972) 24 Cal.App.3d 742, 750 (*Landberg*).)

The six emails attached to the FAC do not demonstrate the existence of a contract between plaintiff and SSS Law, because there is no indication of mutual assent. The first attached email is, on its face, a summary of a telephone discussion regarding terms of a

9

possible future agreement—a list of "deal points" that plaintiff's counsel intended to discuss with his client, once it was confirmed that counsel for both parties were on the same page. Nothing about the first email suggests that it was intended as an offer. The second attached email only confirms, with a clarification on an issue that we need not discuss, that plaintiff's counsel's summary had captured the "gist" of the conversation regarding the outlines of a possible future agreement. To the extent plaintiff argues these two emails evidence offer and acceptance for an agreement regarding payment of a portion of the lessor's legal fees by plaintiff, as opposed to preliminary negotiations towards a possible future agreement, plaintiff's arguments are rejected.

The third attached email is a more definite "proposal" by plaintiff for the terms of a possible agreement, including with respect to plaintiff paying a portion of the lessor's legal fees.[6] In that email, among other things, plaintiff's counsel proposes that plaintiff pay up to $25,000 of the lessor's legal fees, payable "upon execution of the 1st 12 subleases by individual homeowners after approval by the BIA of the [lease extension agreement]." As alleged in the FAC, however, lessor's counsel "did not respond" to this proposal. Silence is hardly the "absolute and unqualified" acceptance required for the formation of a binding contract. (*Landberg*, *supra*, 24 Cal.App.3d at p. 750.) To the contrary, it is well established that, absent extraordinary circumstances not applicable

---

[6] The third email explicitly states that it is a "proposal," made "in light of all [the parties'] prior negotiations and respective positions," not a reflection of a previous agreement, and asks the lessor's counsel to confirm whether the lessor "will consent to the above terms." This language in the third email confirms our interpretation of the first two.

here, silence on the part of an offeree does not constitute acceptance of an offer. (See *McAulay v. Jones* (1952) 110 Cal.App.2d 302, 306-307.)

The fourth attached email does not accept the terms regarding the payment of attorney fees proposed by plaintiff's counsel in the third email sent months earlier, or reflect any prior acceptance of those terms. To the contrary, it demonstrates the parties had not even managed to effectively communicate to one another "what provisions [they] would each like to see in a final document," either regarding the lease extension or a fee agreement. Lessor's counsel asks plaintiff's counsel to "confirm" that plaintiff will be able to pay up to $25,000 in fees immediately upon BIA approval—a payment schedule different from the one previously proposed by plaintiff's counsel in the third attached email.

The fifth attached email reiterates the proposal made in the third, that plaintiff agreed to pay one-half of SSS Law's fees, up to a maximum of $25,000, but with the specification that payment would come only when plaintiff had received $25,000 in extension fees from sublessees. Again, this email does not reflect any agreement between the parties: at most, it reflects that defendant proposed that plaintiff pay $25,000, which plaintiff only qualifiedly accepted, adding a caveat regarding when payment was to be made. As noted, a qualified acceptance is a rejection of the initial offer and a counteroffer, which must in turn be accepted before any contract is formed. (*Landberg*, *supra*, 24 Cal.App.3d at p. 750.)

Plaintiff alleges in the FAC the conclusion that the sixth attached email demonstrates a "grumbling acceptance" of plaintiff's stated terms. The email itself,

11

however, does not support plaintiff's interpretation. (See *Brakke*, *supra*, 213 Cal.App.4th at pp. 767-768.) The lessor's counsel reluctantly expressed willingness to consider plaintiff's counsel's proposal that payment come out of the first extension fees, if immediate payment was not possible. Rather than unqualified acceptance, however, the lessor's counsel required plaintiff to provide a simple written agreement "that will explain how this will work" and provide "some comfort that the fees will be paid in a reasonable manner and in some relatively short amount of time after approval . . . ." In other words, the sixth email is not an acceptance of plaintiff's offer, but an expression of willingness to consider a more detailed, written proposal. No binding contract was thereby formed.

Plaintiff argues that because the lessor eventually signed and notarized a draft lease extension agreement, and lessor's counsel sent the document to plaintiff's counsel for countersignature by plaintiff, a contract regarding payment of fees must have been previously formed; plaintiff characterizes the fee agreement as a "condition precedent" for any lease extension agreement, or even continued negotiation toward such an agreement. The existence of such a condition precedent is not shown, however, by any facts (as distinguished from conclusions) alleged in the FAC, or by any of the documents attached to the FAC. The payment of legal fees was a deal point discussed repeatedly by the parties. Nevertheless, it is hardly inconceivable that the lessor (or lessor's counsel on the lessor's behalf) might have been willing to sacrifice an agreement regarding payment of $25,000 in fees in exchange for immediately putting in place a lease extension

12

agreement worth, according to plaintiff, "millions of dollars" to the lessor and her heirs.[7]

Put another way: nothing about the conduct of the lessor or lessor's counsel alleged in the FAC, or shown the attachments thereto, unambiguously demonstrates willingness to be bound by the terms proposed by plaintiff regarding payment of a portion of the lessor's legal fees.

We also reject plaintiff's various arguments based on the notion that plaintiff and the lessor came to an agreement regarding terms of a lease extension. By sending a signed and notarized draft agreement to plaintiff, the lessor made an offer to enter into a lease extension agreement. Rather than accepting the offer by countersigning and notarizing the document, plaintiff alleges in the FAC that it suggested new and different terms, changing "opt-in extension fees to more incentivize the opt-in tenants." As noted, absent specific circumstances not applicable here, a counteroffer is a rejection, terminating the initial offer. (*Landberg*, *supra*, 24 Cal.App.3d at p. 750.) Thus, when plaintiff later did sign and notarize the document, that act was not an acceptance of an operative offer, but a new counteroffer, which the lessor was free to accept or reject. According to the FAC, the lessor, through her counsel, made a counteroffer of her own, to enter into an agreement on the same terms as had previously been proposed, but only if plaintiff would agree to $35,000 in attorney's fees immediately upon BIA approval. That counteroffer was in turn rejected by plaintiff. Thus, at different times, both plaintiff and

---

[7] We here do not purport to evaluate the truth of plaintiff's assertion regarding the benefits of implementing a lease extension agreement for the lessor and her heirs, but only point out a flaw in the logic of plaintiff's arguments on appeal.

lessor indicated a willingness to enter into a lease extension agreement on the terms described in the document attached to the FAC. They did so, however, at different times, and never when an operative offer from the other party was on the table.

In short, the trial court correctly determined that the facts as alleged, and demonstrated by the documents attached to the FAC, do not show the existence of a contract between plaintiff and SSS Law, a circumstance fatal to plaintiff's only asserted claim. SSS Law's demurrer to the FAC was properly sustained.

### III. DISPOSITION

The judgment is affirmed. Defendant is awarded costs on appeal.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS


HOLLENHORST

J.

We concur:


RAMIREZ

P.J.

CODRINGTON

J.

14